# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**13 CV 5691**

RECEIVED
AUG 1 4 2013
U.S.D.C. S.D. N.Y.
CASHIERS

STEVIE BAGGS, AARON AND JENNIFER
BAILEY, COREY AND TIA BARLOW,
WALTER BERNARD, MICHAEL AND
DEVIANA BLAIR, CEDRIC BONNER, COREY
AND LORI BRIDGES, MICHAEL BROWN,
BARNEY AND BEVERLY BUSSEY, JEREMY
CLARK, JOSHUA COOPER, REGINALD
COOPER, DERRICK CRAWFORD, TRAVIS
CURTIS, REGGIE DAVIS, TERENCE DAVIS,
CODY DOUGLAS, ANTONIO EDWARDS,
AMON GORDON, TYJUAN AND VERNA
HAGLER, JERMAINE AND PAULA HALEY,
JASON HALL, ROBERT AND SUSAN HALL,
ROGER HARPER, JOHNATHAN HOLIFIELD
AND ANTOINETTE JENKINS, JAMES
HUNDON JR., GRADY JACKSON, YUL
JENKINS, MICHAEL JENNINGS, TIM AND
SCHIRIN JOHNSON, TEYO JOHNSON,
VAUGHAN AND SHIRLEY JOHNSON, PAUL
AND ADRIES JORDAN, MELVIN AND DENISE
LUNSFORD, KEYONTA MARSHALL,
DERRECK ROBINSON, REGGIE AND LAURA
ROGERS, JONAS AND VICTORIA SHANELL
SEAWRIGHT, CHADWICK SLAUGHTER,
AHMAAD SMITH, LAWRENCE AND JELISA
SMITH, MARCUS SMITH, SAMMIE SMITH,
DERRICK STEAGALL, MARK WASHINGTON
II, THEODORE AND VERLISA WASHINGTON,
DARIUS AND NICOLE WILLIAMS AND
MELTRIX WILLIAMS,

       Plaintiffs,

      -against-

NATIONAL FOOTBALL LEAGUE,
NFL PROPERTIES, LLC as successor in interest to
NATIONAL FOOTBALL LEAGUE
PROPERTIES, INC., RIDDELL, INC., RIDDELL

[caption cont'd next page]

**INDEX NO.**

**CIVIL ACTION COMPLAINT FOR
DECLARATORY RELIEF, MEDICAL
MONITORING, INJUNCTIVE RELIEF
AND  COMPENSATORY AND PUNITVE
DAMAGES**


**JURY TRIAL DEMAND FOR ALL
CLAIMS
TRIABLE BY A JURY**

1114821.1

SPORTS GROUP, INC., ALL AMERICAN
SPORTS CORP., EASTON-BELL SPORTS, INC.,
EASTON- BELL SPORTS, LLC., EB SPORTS
CORP., and RBG HOLDINGS CORP.,

               Defendants.

## CIVIL ACTION COMPLAINT

Plaintiffs, Stevie Baggs, et al., sue Defendants National Football League, Inc. and NFL Properties, LLC successor in interest to National Football League Properties, Inc.(hereinafter "NFL" ) , Riddell Inc., Riddell Sports Group, Inc. All American Sports Corp., Easton-Bell Sports, Inc., Easton Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. (hereinafter "Riddell" and  the "Riddell Defendants"), and state as follows:

1.      This action seeks declaratory relief, medical monitoring, injunctive relief and compensation for long-term/chronic injuries, financial losses, expenses and intangible losses suffered by Plaintiffs as a result of Defendants' carelessness, negligence, intentional and tortious misconduct, and concealment of information in connection with Defendants' voluntary undertaking with regard to the health effects of repeated head impacts. Plaintiffs are former National Football League ("NFL" or "League") players and certain of their spouses.  The injuries include concussions and repeated head impacts and their sequelae suffered by Plaintiffs during their play in the NFL, including traumatic brain injuries, repetitive sub-concussive head traumas, and latent neurodegenerative disorders and diseases.  Among other things, Defendants failed to protect and warn Plaintiffs and other NFL players against the harmful effects of, and injuries resulting from, repeated head impacts during football training, practice and games.

2.      Plaintiffs incorporate by reference all of the claims set forth in the Plaintiffs' Master Administrative Class Action Complaint and Original Class Action Complaint, In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323, pending in the

1114821.1

Eastern District of Pennsylvania before the Honorable Anita Brody, J. and bring this action

individually and as potential members of the class or subclasses under New York law and other

applicable law.

3.      The action further seeks to recover fair compensation for the Plaintiffs who are

the spouses of the players based upon their right to seek loss of consortium. The allegations

herein, except as to Plaintiffs themselves, are based on information and belief.

<u>**JURISDICTION AND VENUE**</u>

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

the amount in controversy as to each Plaintiff exceeds $75,000.00, exclusive of interest and

costs, and because complete diversity exists between the parties, because the Plaintiffs are

citizens of states which are different from the States where Defendants are incorporated and/or

have their principal places of business.  This is an action for damages as well as medical

monitoring under the common and statutory law of the State of New York and the recovery of

individual damages for Plaintiffs and certain Plaintiffs' spouses based upon, among other claims,

negligence and concealment in the inducement under the laws of the State of New York, and of

the other applicable states' laws.

5.      This Court has personal jurisdiction over Defendants because they have

substantial and continuous business contacts in the State of New York, and because several have

headquarters in New York.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(a) and (b), and 42

U.S.C. § 2000e-5(f)(3), because Defendants conduct business and can be found in this district

and a substantial part of the events and omissions giving rise to the claims alleged herein

occurred in this district.

1114821.1

## THE PARTIES

### PLAINTIFFS

7.     Plaintiff Stevie Baggs is 31 years old and is a citizen and resident of Snellville,

Georgia. Mr. Baggs was a defensive end and linebacker for the NFL. He played for the Detroit

Lions (2004-2005), the Jacksonville Jaguars (2005), the Arizona Cardinals (2010), and the

Baltimore Ravens (2012).   Mr. Baggs suffered repeated and chronic head impacts during his

career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of

latent brain disease. Mr. Baggs has suffered and continues to suffer from permanent injuries

including, but not limited to, severe headaches, memory loss, depression, isolation, mental

anguish, emotional distress and diminished self-esteem.

8.     Plaintiff Aaron Bailey is 41 years old and resides with his wife, Jennifer in

Michigan. They are citizens and residents of Kentwood, Michigan. Mr. Bailey was a wide

receiver and kick return for the NFL. He played for the Indianapolis Colts (1994-1998).   Mr.

Bailey suffered repeated and chronic head impacts during his career in the NFL, both in play as

well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Bailey has

suffered and continues to suffer from permanent injuries including, but not limited to, severe

headaches, memory loss, blurred vision, depression, isolation, mental anguish, emotional distress

and diminished self-esteem. As a result of the injuries Mr. Bailey suffered, Plaintiff Jennifer

Bailey was deprived of marital services including, but not limited to, loss of companionship,

affection and support.

9.     Plaintiff Corey Barlow is 42 years old and resides with his wife, Tia in Georgia.

They are citizens and residents of Ellenwood, Georgia. Mr. Barlow was a cornerback for the

NFL. He played for the Philadelphia Eagles (1991-1992).  Mr. Barlow suffered repeated and

chronic head impacts during his career in the NFL, both in play as well as in practice; and as a

result, he is at increased risk of latent brain disease. Mr. Barlow has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Barlow suffered, Plaintiff Tia Barlow was deprived of marital services including, but not limited to, loss of companionship, affection and support.

10.     Plaintiff Walter Bernard is 35 years old and is a citizen and resident of Pittsburgh, Pennsylvania. Mr. Bernard was a defensive back, cornerback and safety for the NFL. He played for the San Diego Chargers (2001), the Indianapolis Colts (2001-2002) and the Seattle Seahawks (2002-2005). Mr. Bernard suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Bernard has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish and diminished self-esteem. He has been diagnosed as mentally disabled as a result of his repeated and chronic head injuries suffered while playing professional football for the NFL.

11.     Plaintiff Michael Blair is 38 years old and resides with his wife, Deviana in Illinois. They are citizens and residents of Park Ridge, Illinois. Mr. Blair was a fullback for the NFL. He played for the Kansas City Chiefs (1997), NFL Europe (1997-1998 and 2000-2001) the Green Bay Packers (1998-1999), the Cleveland Browns (1999), the New Orleans Saints (2001), XFL (2001-2002) and Arena football (2003-2006). Mr. Blair suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Blair has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the

1114821.1

injuries Mr. Blair suffered, Plaintiff Deviana Blair was deprived of marital services including, but not limited to, loss of companionship, affection and support.

12.     Plaintiff Cedric Bonner is 34 years old and is a citizen and resident of Garland, Texas. Mr. Bonner was a wide receiver for the NFL. He played for the Atlanta Falcons (2005), the Washington Redskins (2007) and the Toronto Argonauts (2008). Mr. Bonner suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Bonner has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

13.     Plaintiff Corey Bridges is 39 years old and resides with his wife, Lori in Georgia. They are citizens and residents of Kennesaw, Georgia. Mr. Bridges was a wide receiver for the NFL. He played for the Minnesota Vikings (1998-1999), the Cleveland Browns (1999-2000), the Chicago Bears (2000-2001) and the Miami Dolphins (2001-2002). Mr. Bridges suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Bridges has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Bridges suffered, Plaintiff Lori Bridges was deprived of marital services including, but not limited to, loss of companionship, affection and support.

14.     Plaintiff Michael Brown is 33 years old and is a citizen and resident of Louisville, Kentucky. Mr. Brown was a kickoff return and linebacker for the NFL. He played for the

Tampa Bay Buccaneers (2004), the Washington Redskins (2004), and the Atlanta Falcons (2005). Mr. Brown suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Brown has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

15.     Plaintiff Barney Bussey is 51 years old and resides with his wife, Beverly in Ohio. They are citizens and residents of West Chester, Ohio. Mr. Bussey was a safety for the NFL. He played for the Cincinnati Bengals (1986-1992) and the Tampa Bay Buccaneers (1993-1995). Mr. Bussey suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Bussey has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Bussey suffered, Plaintiff Beverly Bussey was deprived of marital services including, but not limited to, loss of companionship, affection and support.

16.     Plaintiff Jeremy Clark is 29 years old and is a citizen and resident of Dallas, Texas. Mr. Clark was a defensive tackle for the NFL. He played for the Philadelphia Eagles (2007-2008 and 2010-2011), the New York Giants (2008-2009), the Arizona Cardinals (2009-2010), the Atlanta Falcons (2009-2010) the Dallas Cowboys (2010) and the Washington Redskins (2010). Mr. Clark suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Clark has suffered and continues to suffer from permanent injuries including, but

not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

17.     Plaintiff Joshua Cooper is 32 years old and is a citizen and resident of Kennesaw, Georgia. Mr. Cooper was a defensive line, tight end and running back for the NFL. He played for the San Francisco 49ers (2004-2005) and the New Orleans Saints (2006-2008). Mr. Cooper suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Cooper has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

18.     Plaintiff Reginald Cooper is 45 years old and is a citizen and resident of Rowlett, Texas. Mr. Cooper was an outside linebacker for the NFL. He played for the Dallas Cowboys (1991-1992) and the Chicago Bears Training Camp (1993). Mr. Cooper suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Cooper has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

19.     Plaintiff Derrick Crawford is 52 years old and is a citizen and resident of Memphis, Tennessee. Mr. Crawford was a wide receiver, kick return and punt return for the NFL. He played for the San Francisco 49ers (1987-1990). Mr. Crawford suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Crawford has suffered and continues to

1114821.1

suffer from permanent injuries including, but not limited to, migraine headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

20.     Plaintiff Travis Curtis is 47 years old and is a citizen and resident of Potomac, Maryland. Mr. Curtis was a safety for the NFL. He played for the St. Louis Cardinals (1987), the Washington Redskins (1988 and 1991), the Phoenix Cardinals (1988), the Minnesota Vikings (1989), the New York Jets (1990) and the World League (1992). Mr. Curtis suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Curtis has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

21.     Plaintiff Reggie Davis is 47 years old and is a citizen and resident of Grand Prairie, Texas. Mr. Davis was a wide receiver for the NFL. He played for the Dallas Cowboys (1989-1990). Mr. Davis suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Davis has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

22.     Plaintiff Terence Davis is 40 years old and is a citizen and resident of Houston, Texas. Mr. Davis was a wide receiver and kick return for the NFL. He played for the Tampa Bay Buccaneers (1997), the Kansas City Chiefs (1997), the London Monarchs (1997-19980), the Miami Dolphins Training Camp (1998) and the Scotland Claymores (1998-1999). Mr. Davis suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Davis has suffered

and continues to suffer from permanent injuries including, but not limited to, migraine

headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

23. Plaintiff Cody Douglas is 29 years old and is a citizen and resident of Houston,

Texas. Mr. Douglas was an offensive line for the NFL. He played for the Tennessee Titans

(2006-2007) and the Houston Texans (2007) Mr. Douglas suffered repeated and chronic head

impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at

increased risk of latent brain disease. Mr. Douglas has suffered and continues to suffer from

permanent injuries including, but not limited to, severe headaches, memory loss, depression,

isolation, mental anguish, emotional distress and diminished self-esteem.

24. Plaintiff Antonio Edwards is 43 years old and is a citizen and resident of

Moultrie, Georgia. Mr. Edwards was a defensive end for the NFL. He played for the Seattle

Seahawks (1993-1997), the New York Giants (1997-1998), the Atlanta Falcons (1998-1999) and

the Carolina Panthers (1999-2000). Mr. Edwards suffered repeated and chronic head impacts

during his career in the NFL, both in play as well as in practice; and as a result, he is at increased

risk of latent brain disease. Mr. Edwards has suffered and continues to suffer from permanent

injuries including, but not limited to, severe headaches, memory loss, depression, isolation,

mental anguish, emotional distress and diminished self-esteem.

25. Plaintiff Amon Gordon is 31 years old and is a citizen and resident of Mountain

View, California. Mr. Gordon was a defensive lineman for the NFL. He played for the

Cleveland Browns (2004-2006), the Denver Broncos (2006-2007), the Baltimore Ravens (2007-

2008), the Tennessee Titans (2008-2009 and 2010), the Philadelphia Eagles (2009-2010), the

New England Patriots (2010), the Seattle Seahawks (2010-2011), and the Kansas City Chiefs

(2011-2012). Mr. Gordon suffered repeated and chronic head impacts during his career in the

NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Gordon has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem. He has been diagnosed as mentally disabled as a result of his repeated and chronic head injuries suffered while playing professional football for the NFL.

26. Plaintiff Tyjuan Hagler is 31 years old and resides with his wife, Verna in Ohio. Plaintiffs are citizens and residents of Cincinnati, Ohio. Mr. Hagler was a running back and linebacker for the NFL. He played for the Indianapolis Colts (2005-2010 and 2010-2011) and the Seattle Seahawks (2010). Mr. Hagler suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Hagler has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory issues, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Hagler suffered, Plaintiff Verna Hagler was deprived of marital services including, but not limited to, loss of companionship, affection and support.

27. Plaintiff Jermaine Haley is 40 years old and resides with his wife, Paula in Canada. Plaintiffs are citizens and residents of British Colombia, Canada. Mr. Haley was a defensive tackle for the NFL. He played for the Miami Dolphins (2001-2003) and the Washington Redskins (2004-2005). Mr. Haley suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Haley has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory issues, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr.

1114821.1

Haley suffered, Plaintiff Paula Haley was deprived of marital services including, but not limited to, loss of companionship, affection and support.

28.    Plaintiff Jason Hall is 29 years old and is a citizen and resident of Marietta, Georgia.  Mr. Hall was an offensive and defensive tackle back for the NFL.  He played for the Buffalo Bills (2006), Tennessee Titans (2007), and the Carolina Panthers (2007).  Mr. Hall suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Hall has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory issues, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

29.    Plaintiff Robert Hall is 42 years old and resides with his wife, Susan in Texas. Plaintiffs are citizens and residents of Frisco, Texas.  Mr. Hall was a wide receiver for the NFL. He played for the Baltimore Ravens Training Camp (1997) and the Kansas City Chiefs Training Camp (1999).  Mr. Hall suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Hall has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory issues, depression, isolation, mental anguish, emotional distress and diminished self-esteem.  As a result of the injuries Mr. Hall suffered, Plaintiff Susan Hall was deprived of marital services including, but not limited to, loss of companionship, affection and support.

30.    Plaintiff Roger Harper is 42 years old and is a citizen and resident of Columbus, Ohio.  Mr. Harper was a running safety for the NFL.  He played for the Atlanta Falcons (1993-1995) and the Dallas Cowboys (1996-1997).  Mr. Harper suffered repeated and chronic head

impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Harper has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory issues, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

31.    Plaintiff Johnathan Holifield is 49 years old and resides with his wife, Antoinette in Ohio.  Plaintiffs are citizens and residents of Cleveland, Ohio.  Mr. Holifield was a running back for the NFL.  He played for the Cincinnati Bengals Training Camp (1987 and 1989) and the Cincinnati Bengals (1988-1989).  Mr. Holifield suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Holifield has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.  As a result of the injuries Mr. Holifield suffered, Plaintiff Antoinette Jenkins was deprived of marital services including, but not limited to, loss of companionship, affection and support.

32.    Plaintiff James Hundon, Jr. is 42 years old and is a citizen and resident of Bay Point, California.  Mr. Hundon was a wide receiver, kick runner, punt returner and member of the kickoff team for the NFL.  He played for the Cincinnati Bengals (1996-2000).  Mr. Hundon suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Hundon has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

1114821.1

33.     Plaintiff Grady Jackson is 42 years old and is a citizen and resident of Braselton, Georgia.  Mr. Jackson was a defensive tackle for the NFL.  He played for the Oakland Raiders (1997-2002), the New Orleans Saints (2002-2003), the Green Bay Packers (2003-2007), the Atlanta Falcons (2007-2009), the Jacksonville Jaguars (2009), the Atlanta Falcons (2009-2010) and the Detroit Lions (2010-2013).  Mr. Jackson suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Jackson has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

34.     Plaintiff Yul Jenkins is 45 years old and is a citizen and resident of Cincinnati, Ohio.  Mr. Jenkins was a linebacker for the NFL.  He was on the practice squad for the New York Jets (1991 and 1992).  Mr. Jenkins suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Jenkins has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

35.     Plaintiff Michael Jennings is 33 years old and is a citizen and resident of Jacksonville, Florida.  Mr. Jennings was a wide receiver for the NFL.  He played for the San Francisco 49ers (2002), the Baltimore Ravens (2004), the New England Patriots (2004), and the New York Giants (2004-2008).  Mr. Jennings suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Jennings has suffered and continues to suffer from permanent injuries

including, but not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

36.     Plaintiff Tim Johnson is 35 years old and resides with his wife, Schirin in Ohio. Plaintiffs are citizens and residents of Youngstown, Ohio.  Mr. Johnson was a linebacker for the NFL.  He played for the Baltimore Ravens (2001), the Chicago Bears (2001-2002), and the Oakland Raiders (2003-2005).  Mr. Johnson suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Johnson has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.  As a result of the injuries Mr. Johnson suffered, Plaintiff Schirin Johnson was deprived of marital services including, but not limited to, loss of companionship, affection and support.

37.     Plaintiff Teyo Johnson is 31 years old and is a citizen and resident of Lynwood, Washington.  Mr. Johnson was a tight end for the NFL.  He played for the Oakland Raiders (2003-2005), the Arizona Cardinals (2005), the Miami Dolphins (2006), the Denver Broncos (2007), the Hamburg Sea Devils and the Buffalo Bills (2008).  Mr. Johnson suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Johnson suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, shoulder pain, memory loss, depression, mental anguish, emotional distress and diminished self-esteem.

38.     Plaintiff Vaughan Johnson is 51 years old and resides with his wife, Shirley in North Carolina.  Plaintiffs are citizens and residents of Morehead City, North Carolina.  Mr. Johnson was a linebacker for the NFL.  He played for the New Orleans Saints (1985-1993) and

the Philadelphia Eagles (1994-1995). Mr. Johnson suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Johnson has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Johnson suffered, Plaintiff Shirley Johnson was deprived of marital services including, but not limited to, loss of companionship, affection and support.

39.     Plaintiff Paul Jordan is 51 years old and resides with his wife, Adries in Louisiana. Plaintiffs are citizens and residents of Kenner, Louisiana. Mr. Jordan was a running back for the NFL. He played for the New Orleans Saints (1986-1992). Mr. Jordan suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Jordan has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Jordon suffered, Plaintiff Adries Jordan was deprived of marital services including, but not limited to, loss of companionship, affection and support.

40.     Plaintiff Melvin Lunsford is 63 years old and resides with his wife, Denise in Ohio. Plaintiffs are citizens and residents of Cincinnati, Ohio. Mr. Lunsford was a defensive end for the NFL. He played for the Oakland Raiders (1972), the Atlanta Falcons (1972-1973), the Washington Redskins (1973), the New England Patriots (1973-1980), the Cincinnati Bengals (1980-1981) and the New Jersey Generals (1981-1982). Mr. Lunsford suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Lunsford has suffered and continues to

suffer from permanent injuries including, but not limited to, severe headaches, speech issues, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.  As a result of the injuries Mr. Lunsford suffered, Plaintiff Denise Lunsford was deprived of marital services including, but not limited to, loss of companionship, affection and support.

41.     Plaintiff Keyonta Marshall is 31 old and is a citizen and resident of Saginaw, Michigan.  Mr. Marshall was a defensive lineman for the NFL.  He played for the Philadelphia Eagles (2005), the New York Jets (2006) and the Baltimore Ravens training camp (2007).  Mr. Marshall suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Marshall has suffered and continues to suffer from permanent injuries including, but not limited to, cognitive and other difficulties, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

42.     Plaintiff Derreck Robinson is 31 years old and is a citizen and resident of San Diego, California.  Mr. Robinson was a defensive end for the NFL.  He played for the San Diego Chargers (2005-2006), the Miami Dolphins (2007) and the Cleveland Browns (2009-2010).  Mr. Robinson suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Robinson has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

43.     Plaintiff Reggie Rogers is 49 years old and resides with his wife, Laura in Washington.  Plaintiffs are citizens and residents of Seattle, Washington.  Mr. Rogers was a

1114821.1

defensive end for the NFL.  He played for the Detroit Lions (1987-1988), the Buffalo Bills (1991) the Tampa Bay Buccaneers (1992) and Canadian Football (1993-1996).  Mr. Rogers suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Rogers has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, seizures, depression, isolation, mental anguish, emotional distress and diminished self-esteem.  As a result of the injuries Mr. Rogers suffered, Plaintiff Laura Rogers was deprived of marital services including, but not limited to, loss of companionship, affection and support.

44.     Plaintiff Jonas Seawright is 31 years old and resides with his wife, Victoriashanell in Texas.  Plaintiffs are citizens and residents of Fort Worth, Texas.  Mr. Seawright was a defensive tackle for the NFL.  He played for the New York Giants (2005-2007) and the Dallas Cowboys training camp (2009).  Mr. Seawright suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Seawright has suffered and continues to suffer from permanent injuries including, but not limited to severe headaches, tremors, speech issues, memory loss, depression, isolation, mental anguish and diminished self-esteem.  As a result of the injuries Mr. Seawright suffered, Plaintiff Victoriashanell Seawright was deprived of marital services including, but not limited to, loss of companionship, affection and support.

45.     Plaintiff Chadwick Slaughter is 35 years old and is a citizen and resident of Desoto, Texas.  Mr. Slaughter was an offensive lineman for the NFL.  He played for the Dallas Cowboys (2000), the New York Jets (2000-2001), the Oakland Raiders (2001-2007), the Jacksonville Jaguars (2008) and the Baltimore Ravens (2008).  Mr. Slaughter suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as

1114821.1

a result, he is at increased risk of latent brain disease. Mr. Slaughter has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

46.    Plaintiff Ahmaad Smith is 30 years old and is a citizen and resident of East Point, Georgia. Mr. Smith was a defensive back for the NFL. He played for the Baltimore Ravens (2001), the Chicago Bears (2001-2002), and the Oakland Raiders (2003-2005). Mr. Smith suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Smith has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

47.    Plaintiff Lawrence Smith is 33 years old and resides with his wife, Jelisa in Georgia. Plaintiffs are citizens and residents of Jonesboro, Georgia. Mr. Smith was an offensive line for the NFL. He played for the Baltimore Ravens (2002-2003) and the Buffalo Bills (2004-2006). Mr. Smith suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Smith has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, nerve issues in his back, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Smith suffered, Plaintiff Jelisa Smith was deprived of marital services including, but not limited to, loss of companionship, affection and support.

48.    Plaintiff Marcus Smith is 32 years old and is a citizen and resident of Memphis, Tennessee. Mr. Smith was a defensive back for the NFL. He played for the Tennessee Titans

(2002 preseason) and the Indianapolis Colts (2003 preseason). Mr. Smith suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Smith has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, speech issues, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

49.    Plaintiff Sammie Smith is 46 years old and is a citizen and resident of Mount Dora, Florida. Mr. Smith was a running back for the NFL. He played for the Miami Dolphins (1989-1991) and the Denver Broncos (1992). Mr. Smith suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Smith has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

50.    Plaintiff Derrick Steagall is 39 years old and is a citizen and resident of Hiram, Georgia. Mr. Steagall was a wide receiver for the NFL. He played for the Miami Dolphins (1998-1999). Mr. Steagall suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Steagall has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

51.    Plaintiff Mark Washington, II is 27 years old and is a citizen and resident of San Jose, California. Mr. Washington was a wide linebacker for the NFL. He played for the San Francisco 49ers (2007 and 2009), the Miami Dolphins (2007-2008), the Arizona Cardinals

1114821.1

(2009-2010), and the Minnesota Vikings (2011). Mr. Washington suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Washington has suffered and continues to suffer from permanent injuries including, but not limited to, migraine headaches, blurred vision, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

52.     Plaintiff Theodore Washington is 45 years old and resides with his wife, Verlisa Washington in North Carolina. Plaintiffs are citizens and residents of Waxhaw, North Carolina. Mr. Washington was a nose tackle for the NFL. He played for the San Francisco 49ers (1991-1994), the Denver Broncos (1994-1995), the Buffalo Bills (1995-2001), the Chicago Bears (2001-2003), the New England Patriots (2003-2004), the Oakland Raiders (2004-2006), and the Cleveland Browns (2006-2008). Mr. Washington suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Washington has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem. As a result of the injuries Mr. Washington suffered, Plaintiff Verlisa Washington was deprived of marital services including, but not limited to, loss of companionship, affection and support.

53.     Plaintiff Darius Williams is 31 years old and resides with his wife, Nicole in Georgia. Plaintiffs are citizens and residents of Atlanta, Georgia. Mr. Williams was a tight end for the NFL. He played for the New York Giants (2005), the St. Louis Rams (2005-2006), the Detroit Lions (2006), and NFL Europe (2007-2008). Mr. Williams suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he

1114821.1

is at increased risk of latent brain disease. Mr. Williams has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, memory loss, depression, isolation, mental anguish, emotional distress and diminished self-esteem.  As a result of the injuries Mr. William suffered, Plaintiff Nicole Williams was deprived of marital services including, but not limited to, loss of companionship, affection and support.

54.     Plaintiff Meltrix Williams is 40 years old and is a citizen and resident of Cypress, Texas.  Mr. Williams was a safety for the NFL.  He played for the San Diego Chargers (1997-1999), and the Cleveland Browns (1999-2000).  Mr. Williams suffered repeated and chronic head impacts during his career in the NFL, both in play as well as in practice; and as a result, he is at increased risk of latent brain disease. Mr. Williams has suffered and continues to suffer from permanent injuries including, but not limited to, severe headaches, depression, isolation, mental anguish, emotional distress and diminished self-esteem.

**DEFENDANTS**

55.     Defendant NFL, which maintains its offices at 280 Park Avenue, New York, New York, is an unincorporated association consisting of the 32 separately-owned and independently-operated professional football teams that are listed below.  The NFL is engaged in interstate commerce in the business of, among other things, operating the sole major professional football league in the United States.

56.     The NFL is not, and has not been, the employer of Plaintiffs, all of whom were employed during their respective careers in professional football by the clubs indicated above. The United States Supreme Court held last year in American Needle, Inc. v. NFL, 130 S.Ct. 2201, 2212-13 (2010), that each team that is a member of the NFL association is a legally distinct and separate entity from both other teams and the League itself:

The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousnesses," and "[t]heir objectives are" not "common." . . . . The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel.

57.     The 32 separately-owned and independently-operated professional football teams

mentioned above are:

| NFL Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |

1114821.1

| NFL Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football Inc. | Maryland | Washington Redskins |

58.     Defendant NFL Properties, LLC as the successor-in-interest to National

Defendant NFL Properties, LLC as the successor-in-interest to National Football League

Properties Inc. ("NFL Properties") is a limited liability company organized and existing under

1114821.1

the laws of the State of Delaware with its headquarters in the State of New York. NFL Properties is engaged in, among other activities, approving, licensing and promoting equipment used by all the NFL teams. NFL Properties regularly conducts business in Pennsylvania.

59.     Defendants National Football League and NFL Properties shall be referred to collectively herein as the "NFL" or "League."

60.     The NFL caused or contributed to the injuries alleged herein through its voluntary undertaking including its acts and omissions in misrepresenting the true risks of repeated traumatic brain and head impacts in NFL football, and failing to take appropriate steps to prevent and mitigate repeated traumatic brain and head impacts in the NFL and the latent neurodegenerative disorders and diseases caused by these impacts.

61.     Defendant Riddell, Inc. (d/b/a/ Riddell Sports Group, Inc.) is a corporation organized and existing under the laws of the state of Illinois, and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989, has been the official helmet of the NFL. Riddell, Inc. regularly does business in the State of New York as well as throughout the U.S.

62.     Defendant All American Sports Corporation (d/b/a Riddell\All American) is a corporation organized and existing under the laws of the state of Delaware and is engaged in the business of designing, manufacturing, selling, and distributing football equipment including helmets to the NFL; since 1989, Defendant All American Sports Corporation has been the official helmet of the NFL. All American Sports regularly conducts business in the state of New York as well as throughout the United States.

63.     Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business at 6255 North State Highway, #300, Irving, Texas 76038. Riddell Sports

Group, Inc. regularly conducts business in the state of New York as well as throughout the United States.

64.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc. and is incorporated in Delaware, with its principal place of business at 152 West 57th Street, New York, New York 10019.  Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.  Easton-Bell Sports, LLC regularly conducts business in the state of New York as well as throughout the United States.

65.     Defendant Easton-Bell Sports, Inc. is a Delaware Corporation with its principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, California 91406.  Defendant Easton-Bell Sports, Inc. is the parent corporation of Riddell Sports Group Inc. Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.

66.     Defendant EB Sports Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, California 91406.

67.     Defendant RBG Holdings Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, California 91406. Defendants Riddell, Inc., Riddell Sports Group, Inc., All American Sports Corporation, and Easton Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp. are alter egos and agents of one another and were so intertwined in the business of designing, manufacturing, advertising, promoting, selling and distributing the helmets at issue as to make it impossible to discern the difference between and among them.

68.     Defendants EB Sports Corp., RBG Holdings Corp., Easton-Bell Sports, Inc., Riddell, Inc., Riddell Sports Group, Inc., All American Sports Corporation, and Easton Bell Sports, LLC shall be referred to hereinafter collectively as "Riddell" or "the Riddell Defendants".

## COMMON ALLEGATIONS

69.     Joinder is permissible pursuant to Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same series of occurrences, and questions of law or fact common to all Plaintiffs arise in this action.

70.     Common questions of law and fact will arise in this action including, but not limited to the following.  One or more of the following questions could be jointly tried, herein or in connection with the related cases before the Court in MDL 2323:

        a.     Whether the NFL, through its own voluntary undertaking, was negligent in its response to the health effects of repeated head impacts and the injuries suffered by Plaintiffs;

        b.     Whether § 301 of the Labor Relations Management Act preempts Plaintiffs' tort law claims pled herein, to which Plaintiffs uniformly disagree;

        c.     Whether the NFL committed negligence and/or fraud in misrepresenting the risks of repeated head impacts in NFL play to Plaintiffs;

        d.     Whether the NFL engaged in a civil conspiracy with Riddell, Inc. and others to hide the truth and misinform the players about the true risks posed by repetitive head traumas; and,

        e.     Whether repeated head impacts during play in the NFL cause latent neurodegenerative brain disorders and disease.

1114821.1

## NATURE OF THE NFL'S BUSINESS

71.     The primary business in which the NFL and its member clubs are engaged is the

operation of major league professional football teams and the sale of tickets and telecast rights to

the public for the exhibition of the individual and collective football talents of players such as

Plaintiffs.

72.     The NFL's transactions involve collective annual expenditures and receipts in

excess of $9.3 billion. But, as Dan Greeley, CEO of Network Insights, has noted:

> The NFL is like Procter & Gamble. There's the holding company,
> the core operation, but then each brand has its own team and world
> of revenue. Like Tide: That's a P&G product but within that there
> are different types of Tide and a number of people that make
> money from it. So the $9.3 billion pie just scratches the surface and
> doesn't get into how much is spent around stadiums, merchandise,
> agents, all the way down to mom-and-pop shops.

73.     Annually, the NFL redistributes upwards of $4 billion in radio, television and

digital earnings to the clubs that are part of the NFL association —$125 million apiece, plus an

equal share for the league—and that number shows no sign of declining. The 19 highest-rated

fall television programs (and 28 of the top 30) were NFL games, and this year's Super Bowl was

the most-watched program ever.  The NFL earns enormous amounts annually from its telecasting

deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox

($712.5 million), and CBS ($622.5 million).

74.     Companies pour money into the League's coffers for the right to associate their

brands with the NFL.  Among those making such contributions are Pepsi ($560 million over

eight years, starting in 2004) and Gatorade ($45 million a year, plus marketing costs and free

Gatorade for teams).  Verizon is paying $720 million over four years to be the League's wireless

service provider.  Nike paid $1.1 billion to acquire the NFL's apparel sponsorship.  Previous

partner Reebok had been selling $350 million annually in NFL-themed gear.  The League has a

$1.2 billion, six-year deal with beer sponsor Anheuser-Busch, but teams still cut their own deals when it comes to pouring rights at stadiums. On September 7, 2011, it was announced that the NFL signed a new 10-year $2.3 billion deal with Pepsi, which is one of the largest sponsorship deals in sports history. It encompasses a number of Pepsi brands (Pepsi, Frito-Lay, Tropicana, Quaker Oats and Gatorade). This deal, combined with a number of other new sponsorships, ticket sales projections & TV ratings, means that the NFL is projecting record revenues of over $9.5 billion this season.

75.     Teams can collect $25-$30 million for stadium naming rights, usually on 10-year deals. The largest is Reliant Energy's $10 million per year contract with the Houston Texans. In Los Angeles, Farmers Insurance has promised $700 million over 30 years to name a stadium for a team that does not even exist yet.

76.     Many clubs that are part of the NFL association own in whole or in part the stadiums in which they play, which can be a source of major commercial value, as reflected in the following chart:

| STADIUM, TEAM | OPENED | PRICE (2010 DOLLARS) | % PRIVATE |
|---|---|---|---|
| New Meadowlands, NY | 2010 | $1.6B | 100 |
| Cowboys Stadium, DAL | 2009 | $1.15B | 56 |
| Lucas Oil Field, IND | 2008 | $780M | 13 |
| U. of Phoenix Stadium, ARI | 2006 | $493M | 32 |
| Lincoln Financial, PHI | 2003 | $588M | 65 |
| Ford Field, DET | 2002 | $504M | 49 |

1114821.1

| STADIUM, TEAM | OPENED | PRICE (2010 DOLLARS) | % PRIVATE |
|---|---|---|---|
| Gillette Stadium, NE | 2002 | $373M | 100 |
| Reliant Stadium, HOU | 2002 | $526M | 39 |
| Qwest Field, SEA | 2002 | $422M | 29 |
| Invesco Field, DEN | 2001 | $683M | 39 |
| Heinz Field, PIT | 2001 | $312M | 16 |

77.    In 2010, more than 17 million fans passed through turnstiles operated by clubs that are part of the NFL association, paying anywhere from $54.51 (Cleveland Browns) to $117.84 (New England Patriots) for the average game ticket.  Though the League will not disclose the exact amounts, the numbers for the publicly-held Green Bay Packers ("Packers") offer some insight into what teams reap at the ticket office and concession stands.  In 2010, the Packers cleared $60,059,646 from home and away game tickets plus private boxes per game.  Projected over 32 teams, that is nearly $2 billion annually.  The Packers reaped $13 million from concessions, parking and local media in 2010, which translates to $416 million on a league-wide basis.

## FACTUAL ALLEGATIONS

### A.    Concussions And Head Injuries: the Science And the NFL's Responses To It.

78.    A 2011 article in the Journal of Sports & Entertainment Law of Harvard Law School summed up the consequences of concussions to athletes (footnotes omitted):

> From high school leagues to the NFL, football players are becoming bigger, faster, and stronger, thereby increasing the force of collisions that occur during a game and increasing the potential for serious injuries. The brain is a soft organ, surrounded

by cerebrospinal fluid and protected by the tough, bony skull. Normally, the fluid around the brain serves as a protective cushion for the brain, isolating it from direct impact to the skull. When the head suffers violent impact, the brain can hit the skull, causing the brain temporarily to stop working normally. This is called a concussion.

More serious injuries occur after the initial concussion. A concussion causes brain cells to become depolarized and allows neurotransmitters to behave in an abnormal fashion, causing such symptoms as memory loss, nausea, and confusion. After the initial concussion, when the brain is not fully healed, it is very fragile and susceptible to minor accelerative forces. Thus, subsequent minor hits may cause traumatic and permanent brain injury. This is the heart of the problem: players returning to the football field before allowing their initial concussion to heal fully. When the player returns to the field too early, he is at risk for what is known as Second Impact Syndrome (SIS). SIS is the event that ensues when there is a subsequent brain impact before the initial concussion has been given time to heal. Additionally, when concussions occur with high frequency, a disease called Chronic Traumatic Encephalopathy (CTE) may occur in the brain. "CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain which eventually leads to dementia." While CTE was originally diagnosed most commonly in boxers, it is now regularly found in football players. **Of all sports related injuries, concussions are the injuries that most often go unnoticed and untreated, especially in football**. (Emphasis added).

79.    The following chart, excerpted from a 2010 article in the *New England Journal of Medicine* entitled "Traumatic Brain Injury--Football, Warfare And Long-Term Effects" shows how even repetitive mild traumas can have lasting consequences:



80.     The NFL's responses to the issue of brain injuries caused  to retired NFL players because of concussions or head impacts received during  the period that they played professional football has been, until very recently, one of deception and denial.  The NFL and several of the scientists it employed actively tried to conceal the extent of the problem until recently.

81.     The response of the League once it acknowledged the medical concern posed by repetitive head impacts has been inadequate.

82.     The collective bargaining agreements ("CBAs"), negotiated between the League and the NFL Players' Association, do not address or otherwise create obligations of the NFL to disclose the risks associated with, prevent, or treat concussions or brain injuries incurred by present or former NFL players. Nor did any CBA deal with the creation or operation of the Mild Traumatic Brain Injury Committee ("MTBI Committee", sometimes also referred to in press reports as the "Concussion Committee"), which was created by the NFL's own initiative and voluntary undertaking in 1994. The "experts" who functioned on the MTBI Committee operated independently of any CBA and were not a party to any CBA. To the extent that the NFL or its agents (including, but not limited to, the MTBI and its members) issued pronouncements, assurances or warnings about the dangers or risks of concussions, they have done so independently of any CBA.

83.     The League's disinformation campaign was spearheaded by its MTBI Committee, which was chaired from 1994 to February of 2007 by Dr. Elliott Pellman ("Pellman"), a rheumatologist who reportedly attended medical school in Guadalajara, Mexico. Dr. Pellman worked with two other scientists on the MTBI Committee—Dr. Ira Casson ("Casson"), a neurologist, and Dr. David Viano ("Viano"), a biomechanical engineer—to attempt to discredit a slew of scientific studies that linked head impacts and concussions received by NFL players to brain injuries.  Drs. Casson and Viano replaced Dr. Pellman as co-chairs of the MTBI Committee in February 2007.

84.     Since 1994, the MTBI Committee had been conducting a study to determine the effect of concussions on the long-term health of retired NFL players.  In a November 2007 report

to Congress, NFL Commissioner Roger Goodell ("Goodell") said that the MTBI Committee's

study was in its "initial" data collection phase and that "[w]e do not know when this study will

be completed, although it is likely that a comprehensive study will require at least several years

of research and analysis."

85.     In October of 2006, Drs. Pellman and Viano published in Neurological Focus an

interim report on the MTBI Committee's efforts that surveyed 12 years of data collection. The

authors analyzed collected "data on mild TBIs sustained between 1996 and 2001" and concluded

that:

> **[B]ecause a significant percentage of players returned to play
> in the same game [as they suffered a mild traumatic brain
> injury] and the overwhelming majority of players with
> concussions were kept out of football-related activities for less
> than 1 week, it can be concluded that mild TBIs in professional
> football are not serious injuries.** (Emphasis added).

86.     As explained further below, this conclusion was against the weight of the

scientific evidence, a fact that the members of the MTBI Committee well knew; it was also based

on biased data collection techniques.  As ESPN reported in February of 2007:

> **Last fall, ESPN The Magazine reported that Pellman was
> selective in his use of injury reports in reaching his conclusions
> and omitted large numbers of players from the league's
> concussion study. His findings also contradicted other scientific
> studies into the effects of concussions:**
>
> **• In January 2005, Pellman and his colleagues wrote that
> returning to play after a concussion "does not involve
> significant risk of a second injury either in the same game or
> during the season." But a 2003 NCAA study of 2,905 college
> football players found just the opposite: Those who have
> suffered concussions are more susceptible to further head
> trauma for seven to 10 days after the injury.**
>
> **• Pellman, a rheumatologist, and his group have also stated
> repeatedly that their work shows "no evidence of worsening
> injury or chronic cumulative effects of multiple [mild
> traumatic brain injury] in NFL players." But a 2003 report by**

- 34 -

**the Center for the Study of Retired Athletes at the University
of North Carolina found a link between multiple concussions
and depression among former pro players with histories of
concussions. And a 2005 follow-up study at the Center showed
a connection between concussions and both brain impairment
and Alzheimer's disease among retired NFL players.**
(Emphases added).

87.     The concerns about head injuries associated with the playing of football— and the

refusal to recognize those concerns by those in charge of the game—have a long history. On

Monday, February 1st, 2010, Dr. Bennet Omalu ("Omalu"), Co-Director of the Brain Injury

Institute at West Virginia University, spoke before members of the House Judiciary Committee

at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School,

College, and Professional Football."  In his prepared testimony, he explained:

Glenn Pop Warner [1871 – 1954] founded the Pop Warner youth
football league in 1929. He still remains one of the greatest
football coaches in the history of American football. The single
event, which necessitated the use of pads and helmets by football
players, took place in 1888 when the annual rules convention for
the emerging sport of college football passed a rule permitting
tackling below the waist.

"Football changed dramatically. Teams no longer arrayed
themselves across the entire breath of the field. Teams bunched
themselves around the runner to block for him. The wedge and
mass play arrived. Football became, for a time, a savage sport full
of fights, brawling, even fatalities."

**In 1912, Pop Warner said: "Playing without helmets gives
players more confidence, saves their heads from many hard
jolts, and keeps their ears from becoming torn or sore.  I do
not encourage their use.  I have never seen an accident to the
head which was serious, but I have many times seen cases
when hard bumps on the head so dazed the player receiving
them that he lost his memory for a time and had to be removed
from the game."**

We have known about concussions and the effects of concussions
in football for over a century. Every blow to the head is dangerous.
Repeated concussions and sub- concussions both have the capacity
to cause permanent brain damage. During practice and during

1114821.1

games, a single player can sustain close to one thousand or more
hits to the head in only one season without any documented or
reported incapacitating concussion. Such repeated blows over
several years, no doubt, can result in permanent impairment of
brain functioning especially in a child. (Footnotes omitted;
emphases added).

88.    The scientific evidence on concussions and subsequent brain disease in boxing

and other sports has been mounting, but for a long period, the NFL attempted to deny, discredit,

and ignore it.

89.    The risk of repeated head impacts in certain sports and brain disease has been

understood for decades.  In 1928, a New Jersey pathologist, Harrison Martland, described the

clinical spectrum of abnormalities found in "nearly one half of the fighters who stayed in the

game long enough."  Follow-up studies on encephalopathy and repeated head impacts in sport

were published in 1952.  The risk of second impacts (Second Impact Syndrome) in sport was

identified in 1973.  It was also clear by the 1970's that the patterns of neuro-degeneration

associated with head impacts in boxing also occurred in other sports.

90.    From 1931 to 2006, the National Center for Catastrophic Sport Injury Research

has reported 1,006 direct and 683 indirect fatalities resulting from participation in all organized

football in the United States; the annual number of indirect fatalities has remained near 9.0 per

year.

91.    A 1994 Ball State University survey found that "players in the 1980s suffered

serious injuries and underwent operations at twice the rate of those who played in the 1950s or

earlier."

92.    A study presented at the American Academy of Neurology's 52nd Annual

Meeting in 2000 and authored principally by Dr. Barry Jordan, Director of the Brain Injury

Program at Burke Rehabilitation Hospital in White Plains, New York, surveyed 1,094 former

1114821.1

NFL players between the ages of 27 and 86 and found that: (a) more than 61% had suffered at least one concussion in their careers with 30% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16 % were unable to dress themselves; and 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

93.    A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athlete Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.

94.    A series of important studies emanated from the University of North Carolina ("UNC"), which were attacked by members of the NFL's MTBI Committee.

95.    A 2000 UNC study found that in the period between 1977 and 1998, an annual average of 13 athletes had suffered catastrophic injuries (primarily permanent paralysis) as the direct result of participation in football. The study also found that between 1977 and 1998, 200 football players received a permanent cervical cord injury, and 66 sustained a permanent cerebral injury." As reported in Science Daily:

> The study, published in the September-October issue of the American Journal of Sports Medicine, suggests that the brain is more susceptible to injury when it has not had enough time to recover from a first injury. Researchers say the finding is important because concussions can lead to permanent brain damage, vision impairment or even death if not managed properly.
>
> **"We believe recurrences are more likely because injured players are returning to practice and to games too quickly after blows to the head," said Dr. Kevin M. Guskiewicz, assistant professor of exercise and sport science at UNC-CH**

1114821.1

**and study leader. "Many clinicians are not following the
medical guidelines that players should be symptom-free for
several days before returning."** (Emphases added).

96.     A 2003 study partially authored by the aforementioned Dr. Kevin Guskiewicz

("Guskiewicz") of UNC analyzed data from almost 2,500 retired NFL players and found that 263

of the retired players suffered from depression.  The study found that having three or four

concussions meant twice the risk of depression as never-concussed players and five or more

concussions meant a nearly threefold risk.

97.     In November of 2003, Guskiewicz was scheduled to appear on HBO's "Inside the

NFL" to discuss his research. Pellman, who was also going to be on the show, called

Guskiewicz.  "I had never spoken with him before, and he attacked me from the get-go,"

Guskiewicz said.  "He questioned whether it was in my best interest to do the show. He was a

bull in a china shop."  **On the program, Pellman said unequivocally, "[w]hen I look at that
study, I don't believe it."** (Emphasis added).

98.     In 2005, Guskiewicz did a follow-up to his 2003 study and found that retired NFL

players who sustained three or more concussions had a fivefold greater likelihood of suffering

Mild Cognitive Impairment ("MCI") than retired NFL players who had no history of

concussions. Guskiewicz based his conclusions on a survey of over 2,550 former NFL players.

**Dr. Mark Lovell ("Lovell") of the NFL's MTBI Committee asserted that Guskiewicz's
study lacked "scientific rigor" and that one couldn't tell anything from a survey.**

99.     **"Pellman's committee has repeatedly questioned and disagreed with the
findings of researchers who didn't come from their own injury group," said Julian Bailes,
Chairman of Neurosurgery at West Virginia University.**

100.    The MTBI Committee decided to respond to these types of studies by presenting

biased research derived from its ongoing survey of retired NFL players.  ESPN The Magazine

described what happened:

> In October 2003, Pellman and members of his committee
> published the first of a long-running series on concussions in
> Neurosurgery, a scholarly journal edited by Mike Apuzzo, the New
> York Giants' neurosurgical consultant. The committee's earliest
> studies used crash test dummies to reenact helmet blows. Later, the
> group decided to explore the ill effects of multiple concussions,
> and Pellman charged one of its members, Mark Lovell, head of the
> University of Pittsburgh Medical Center's Sports Medicine
> Concussion Program, to oversee the collection and analysis of
> league wide data.  Pellman chose Lovell because he had conducted
> neuropsychological tests for the Steelers as early as 1993. And in
> 1995, Lovell began to run the NFL's neuropsychology program,
> which encouraged teams to gather data to help decide when to
> return players to games. Using the information they would obtain,
> Pellman, Lovell and the committee planned to look at baseline
> results and identify a normal range of scores for uninjured NFL
> players.  Then, comparing post injury scores to baseline data would
> show the effects of concussions. Comparing data from players with
> multiple concussions to that of all injured players would show
> whether concussive effects changed as injuries accumulated.
>
> **A lot was riding on the analysis.** The committee had never
> imposed recommendations on team medical staffs. **But this was
> the first study ever to analyze the brain function of NFL
> athletes. If it showed that concussions were significantly
> impairing players, the league might be forced to institute new
> rules for evaluating and treating head injuries.** Pellman and
> Lovell both say they invited all teams to participate in the research
> (Lovell says 11 teams elected to join the study) and tried to collect
> as many results as they could. As Lovell puts it, "More data is
> always better." **Several of the doctors involved, however, tell a
> different story.**  [William] Barr [a neuropsychologist at Long
> Island Jewish Hospital], for example, conducted 217 baseline tests
> from 1996 to 2001. Periodically, he forwarded results to the
> league, but at the time Barr learned the committee was planning to
> publish its results, he had sent only 149. Barr remembers finding
> Pellman in the Jets' training room in 2003 and saying, "Elliot, I
> haven't sent data for a year." **According to Barr, Pellman didn't
> want the additional tests.** "I don't want the data to be biased
> because I'm with the Jets," Barr recalls him saying, suggesting that
> additional results would skew the data because the Jets would be

overrepresented in the sample. **That made no sense to Barr. A scientific study should include, or at least address, all available data.**

Pellman denies this conversation ever took place. "Bill Barr was a consultant for the Jets who tested individual players to help us make decisions," he says. "I did not discuss the committee's research with him." **Whoever is right, the fact is the group didn't have all of Barr's data for its paper.**

Barr's wasn't the only research that didn't make the cut. Over the period covered by the committee's research, Christopher Randolph, a Chicago neuropsychologist, collected baselines for 287 Bears players. **He says Lovell never asked for his data, either.**

**Nor did the committee seek complete data from John Woodard, neuropsychologist for the [Atlanta] Falcons** and associate psychology professor at the Rosalind Franklin University of Medicine and Science in North Chicago. According to Woodard, in December 2003, Lovell said the league was pressuring him to compile team results. "I was asked to provide data on only concussed players," Woodard says. "I had data for slightly more than 200 baseline evaluations. I don't know why I was not asked for them."

In 2004, Lovell also asked Richard Naugle, consultant to the Browns and head neuropsychologist at the Cleveland Clinic, for data on just the players who had already suffered concussions, according to an e-mail Naugle wrote to a colleague in March 2005. Naugle declined to comment for this story, citing a confidentiality deal between his medical group and the NFL, but The Magazine has obtained a copy of that message. "I don't have that sorted out from the results of other testing," Naugle wrote of the request. "I explained that and added that if he could name players, I could send data on those individuals. I recall sending him data on two or three players ... I have a few hundred baselines."

**This means Pellman, Lovell and their colleagues didn't include at least 850 baseline test results in their research—more than the 655 that ultimately made it into their 2004 Neurosurgery paper. At best, their numbers were incomplete. At worst, they were biased.**

\*\*\*\*

Pellman, Lovell and their colleagues published their sixth paper in *Neurosurgery* in December 2004. It examined baseline data on 655

players and results for 95 players who had undergone both baseline testing and post-concussion testing. It concluded that NFL players did not show a decline in brain function after suffering concussions. Further analysis found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.

**The paper didn't explain where the players in the groups came from specifically or why certain players were included and hundreds of others were not. Neither Pellman nor Lovell has provided those details since.** (Emphases added).

101.    Scientists concurred with this assessment. As the ESPN The Magazine article

noted:

The decision to publish the paper was controversial. **"I highly doubt this study would have seen the light of day at this journal were it not for the subject matter of NFL players,"** says **Robert Cantú, chief of neurosurgery and director of sports medicine at Emerson Hospital in Concord, Mass., and a senior editor at Neurosurgery. "The extremely small sample size and voluntary participation suggest there was bias in choosing the sample. The findings are extremely preliminary at best, and no conclusions should be drawn from them at this time."**

One of the scientists who reviewed the committee's work is equally blunt. **"They're basically trying to prepare a defense for when one of these players sues,"** he says. **"They are trying to say that what's done in the NFL is okay because in their studies, it doesn't look like bad things are happening from concussions. But the studies are flawed beyond belief."** (Emphases added).

102.    Dr. Guskiewicz was also quoted as saying, **"[t]he data that hasn't shown up**

**makes their work questionable industry-funded research."** (Emphasis added).

103.    Dr. Pellman was not the only NFL hired gun peddling disinformation about head

impacts or concussions and brain injuries. Drs. Casson and Viano of the NFL's MTBI

Committee were playing a similar role, assisted by Lovell.

104.    Between 2005 and 2007, Dr. Omalu and Dr. Robert Cantu ("Cantu"), Co-

Director for the Center for the Study of Traumatic Encephalopathy ("CSTE") at the Boston

University School of Medicine ("BUSM"), examined the brain tissue of three deceased NFL players: (a) Mike Webster ("Webster") of the Pittsburgh Steelers, who died of heart failure at the age of 50; (b) Terry Long ("Long") of the Pittsburgh Steelers, who died at 45 after drinking antifreeze; and (c) Andre Waters ("Waters") of the Philadelphia Eagles and Arizona Cardinals, who committed suicide at the age of 44. All three of these individuals suffered multiple concussions during their respective NFL careers. All three exhibited symptoms of sharply deteriorated cognitive functions, paranoia, panic attacks, and depression. In articles published in Neurosurgery in 2005 and 2006, Dr. Omalu found that Webster's and Long's respective deaths were partially caused by CTE, related to multiple NFL concussions suffered during their professional playing years. Cantu reached a similar conclusion as to Waters in an article published in Neurosurgery in 2007.

105.    The following photographs, available from Brain-Pad Blog, show the contrast between a normal brain (depicted on the left) and Webster's autopsied brain (depicted on the right).



106.    In response to Dr. Omalu's article on Webster, Dr. Casson of the NFL's MTBI Committee wrote a letter in July of 2005 to the editor of *Neurosurgery* asking that Omalu's article be retracted as unreliable.

107.    In 2008, Dr. Ann McKee ("McKee") of the CSTE at BUSM examined the brain tissue of two other deceased NFL players: (a) John Grimsley ("Grimsley") of the Houston Oilers, who died of a gunshot wound at the age of 45; and (b) Tom McHale ("McHale") of the Tampa

Bay Buccaneers, Philadelphia Eagles and Miami Dolphins, who died of a drug overdose at the age of 45. McKee found that Grimsley and McHale's brain tissue exhibited indications of CTE. As she stated, "**the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions.**" (Emphasis added). She further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma." A Washington Post article published in early 2009 reported the following comments by McKee with respect to her analysis of McHale's brain:

> "Is this something that happened by chance?" asked Ann McKee, a neuropathologist at Boston University pointing to pictures of McHale's brain that she said resembled that of a 72-year-old boxer. "**I can tell you I've been looking at brains for 22 years, and this is not a normal part of aging. This is not a normal part of the brain.**" (Emphasis added).

108.    In response to McKee's studies, Dr. Casson continued his campaign of NFL-sponsored disinformation by characterizing each as an isolated incident from which no conclusion could be drawn and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal. When it was so published in 2009, Dr. Casson asserted that "**there is not enough valid, reliable or objective scientific evidence at present to determine whether…repeat head impacts in professional football result in long[-]term brain damage.**" (Emphasis added).

109.    The increasing controversy drew the attention of Congress. On June 23, 2007, hearings on the NFL's compensation of retired players were held before the Commercial and Administrative Law Subcommittee of the Judiciary Committee of the United States House of Representatives ("C&A Subcommittee"). Goodell was one of those who testified at this hearing. In follow-up responses to the C&A Committee that Goodell sent in November of 2007, he continued to rely on the discredited survey research being undertaken by the MTBI Committee.

110.    In response to these hearings and associated media reports, the League scheduled a Concussion Summit in June of 2007.  Independent scientists, including Drs. Omalu, Cantu and Guskiewicz, presented their research to League and to representatives of the NFLPA. As one contemporaneous news article reported:

> "I'm not even sure we athletes know what a concussion is," said safety Troy Vincent, who also is president of the NFL Players Association. "Outside of being knocked out, I stayed in the game."
>
> . . . .
>
> **The NFL commission, after reviewing five years of on-field concussions, found no evidence for an increase in secondary brain injuries after a concussion, a conclusion that has met with skepticism.**
>
> "Science is very clear that returning guys to play in the same game, or quickly within a few days, contributes to neuron loss and long-term problems," said former pro wrestler Christopher Nowinski, who retired after repeated concussions and has written a book on the controversy. "With the NFL being both the only and most prominent voice to say it doesn't exist, it slows down acceptance and adoption of policies to reduce risk."
>
> **While the NFL commission has focused on short-term effects of concussions, recent findings suggest players may suffer depression, dementia and other symptoms later in life.**
> (Emphases added).

111.    The result of this conference was a complete whitewash by the NFL of the problem.  The League issued a press release and pamphlet to players on August 14, 2007.  It stated that:

> **Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems.... It is important to understand that there is no magic number for how many concussions is too many.**
> (Emphasis added).

112.    This act of denial and deception was consistent with the positions taken by NFL doctors Pellman, Casson, Lovell, and Viano as described above.